## Calabrese v. Zoning Board of Adjustment and Schneider, et ux., Intervenors.

Argued February 23, 1972, before President Judge Bowman and Judges Crumlish, Jr., Kramer, Wilkinson, Jr., Mencer, Rogers and Blatt.

*John A. Spaeder,* with him *Marsh, Spaeder, Baur, Spaeder & Schaaf,* for appellants.

*Charles D. Agresti,* with him *Agresti & Agresti,* for appellee.

OPINION BY JUDGE MENCER, May 26, 1972:

This is an appeal from a decision of the Court of Common Pleas of Erie County, which held an amendatory zoning ordinance of the Council of the City of Erie to be invalid and unconstitutional and likewise a building permit issued pursuant to that ordinance to be null and void.

The chronological background of the case is as follows:

*April 11, 1970.* Appellants David Schneider and his wife, Janice, inquired at the office of the Secretary of the Zoning Board of Adjustment of the City of Erie about the procedural steps necessary in order to gain a building permit for the erection of a six-family unit townhouse on an 82′ x 155.77′ lot they were desirous of acquiring located at 1421 West 37th Street in Erie. The Secretary informed them that the lot would have to be rezoned from R-1 low density residential to R-3

high density residential to allow the proposed multiple family structure. He further provided them with a petition form and instructed them to canvass the immediate vicinity of the subject property to ascertain the reaction of the surrounding property owners to the proposed use. Mr. Schneider later testified as to the manner in which he canvassed those property owners: "I assume that I made the same approach to almost all of the people, to whom ever answered the door I'd tell them I have this petition which I would appreciate if they would sign changing the zoning of this piece of property, this eyesore down the street, I want to change the zoning from R-1 which is single dwelling to R-3 which is multiple dwelling *as I wanted to build a townhouse for my father and myself.*" (Emphasis added.)

*April 22, 1970.* The petition with signatures was returned to the Secretary of the Zoning Board of Adjustment and the appropriate fee was paid for the rezoning application.

*May 6, 1970.* A petition was submitted by the Schneiders to City Council requesting rezoning of the subject property from R-1 to R-3. The Council referred the matter to the City Planning Commission for its advice.

*May 20, 1970.* The report of the City Planning Commission was sent to the Council recommending denial of the appellants' petition ". . . because the neighborhood is presently zoned and entirely utilized for low density residential purposes and any rezoning would be considered as spot-zoning that is contrary to the basic principles of sound zoning practice."

*May 27, 1970.* The Planning Commission's report was submitted to the Council which subsequently directed the City Clerk to advertise notice of a public hearing concerning the proposed rezoning to be held

on June 17, 1970. Such notice was advertised on June 2, 9, and 16, 1970.

*June 9, 1970.* Despite the recommendation of the Planning Commission contrary to the rezoning, the Schneiders purchased the subject property.

*June 17, 1970.* A public hearing was held and no protest or objection concerning the proposed rezoning was made by anyone present. The City Solicitor was therefore directed on June 24, 1970, to prepare an ordinance amending the official city ordinance by rezoning the subject property from R-1 to R-3.

*July 8, 1970.* This amending ordinance was passed by Council.

*October 8, 1970.* There is considerable controversy as to what transpired on this date as to an application for a building permit by a Donald F. Schaeffer of Logan Builders on behalf of the Schneiders. Mr. Schaeffer made the application and deposited with the City Building Inspector a check for the permit fee of $144.00. Either at that time or on the next day Schaeffer was informed that the building plans were unacceptable and certain minor changes had to be made before the permit could be valid. The permit, however, was actually executed (No. 96543) and a copy given to Schaeffer. On the next day, October 9, for reasons still not clear, Schaeffer's check for $144.00 was returned to him.[1] The Building Inspector, after returning the check

---

[1] The Building Inspector testified that he returned the check in response to a telephone call by Schaeffer advising that ". . . they did not want to put up this building and wanted their money back." The check was therefore returned to Schaeffer along with an envelope addressed to the Building Inspector which Schaeffer was to use to return the copy of the building permit No. 96543. The Building Inspector later testified that between the time of the return of the check on October 9 and December 8, 1970 (the date of a subsequent Board hearing on the matter), no one representing the builders had tendered the permit fee, that in his opinion no

to Schaeffer, on the same day issued permit No. 96543 to another individual who had sought a permit to construct an addition to his home. Schaeffer meanwhile retained the copy of the permit originally given to him and later gave it to the Schneiders' counsel along with the returned check.

*November 20, 1970.* Appellees Albert Calabrese and the Concerned Homeowner's Association (Association) filed an appeal with the Board from the issuance of the October 8, 1970, building permit and requested a hearing before the Board. The appeal alleged, *inter alia,* that "Ordinance No. 46-1970 rezoning the above mentioned property to R-3 (high density residential district) is not valid since it was not enacted in accordance with a comprehensive plan, and represents illegal spot zoning."

*December 8, 1970.* Such hearing was held before the Board at which the Building Inspector testified that the Schneiders did not possess a valid building permit to construct an apartment building on the site. Nevertheless, the Board found on the following day that the

valid permit existed, and that a permit would have to be secured and the fee paid before construction could begin.

Schaeffer denied making the alleged telephone call but did admit that the check for the fee had been returned to him along with the self-addressed envelope. In explanation, he further testified that at the time he secured the permit and deposited the check he was advised by the Building Inspector that possibly a change would have to be made in the plans, that he told the Building Inspector to hold the check until he contacted the Schneiders about the plan discrepancies, and that when he returned the next day the check was attached to the plans and returned to him without explanation along with the self-addressed envelope.

The Building Inspector's secretary testified that the Building Inspector told her the permit was not to be issued, that the permit was null and void, and the check was to be returned, and that she did return the check to Schaeffer who said, "I am going to turn it back over to the builder. I don't know what is going to happen. There is too much confusion."

permit was properly issued. It did not rule on the validity of the rezoning ordinance since that question, under the circumstances, is properly determined for the first time by the Court of Common Pleas. Pennsylvania Municipalities Planning Code (MPC) §910, 53 P.S. §10910. Subsequently construction on the apartment building was begun, but the Building Inspector immediately ordered that the operations cease as there was, in his opinion, no valid permit then in existence.

*December 21, 1970.* The Schneiders, through their contractor, Logan Builders, again made application for a building permit for a six-unit apartment building, paid the filing fee of $144.00 with the same returned check and with the same plans unchanged from October 8, and were issued building permit No. 96697. Construction of the apartments was thereafter begun.

*December 29, 1970.* The Association filed an appeal from the Board's decision with the Erie County Court of Common Pleas. The court thereupon ". . . ordered that all construction and land development shall cease during the pendency of the Appeal."

*January 20, 1971.* The Association again filed an appeal with the Board challenging the validity of the zoning amendment after learning of the issuance of the December 21, 1970, building permit.

*January 26, 1971.* Having decided that the Building Inspector's testimony on December 8 concerning issuance of the October 8 permit was inconsistent with the finding of the Board and that there was additional testimony available, the court returned the matter to the Board for further hearing and additional findings of fact. Two additional hearings were subsequently held by the Board on March 9 and 17, 1971, at the conclusion of which the Board was still unable to resolve the conflict of testimony as to the circumstances surrounding the return of the $144.00 fee. It did find, how-

ever, that the check was returned by the Building In-spector, that counsel for the Association was notified that a valid permit had not been issued, and that the zoning ordinance amendment was not within the spirit and intent of the city's comprehensive plan.

After oral argument on July 8, 1971, the court in its opinion dated August 9, 1971, decreed the amendment enacted by the City Council on July 8, 1970, invalid and the building permit issued pursuant to that amendment null and void.

Two questions are before us on this appeal: (1) Whether the Association made a timely appeal to the Board within the required 30-day period as set forth in Pennsylvania Municipalities Planning Code (MPC) §915(2), 53 P.S. §10915[2]; and (2) whether the zoning ordinance amendment is invalid because it constituted illegal "spot zoning."

As to the first of these, we note initially that this appeal stems solely from the issuance of the October 8, 1970, building permit. Although the Board had before it the January 20, 1971, appeal from the issuance of the second permit on December 21, 1970, when it held further hearings on March 9 and 17, 1971, it never specifically acted upon the second appeal.

Although not specifically argued by them, appellants would no doubt have us accept the following

---

[2] Section 915 [53 P.S. §10915]. *Time Limitations.* The time limitations for raising certain issues and filing certain proceedings with the board shall be the following: * * * (2) No person shall be allowed to file any proceeding with the board later than thirty days after any application for development, preliminary or final, has been approved by an appropriate municipal officer, agency or body if such proceeding is designed to secure reversal or to limit the approval in any manner unless such person alleges and proves that he failed to receive adequate notice of such approval. If such person has succeeded to his interest after such approval, adequate notice to his predecessor in interest shall be deemed adequate notice to him.

language from R. Ryan, *Pennsylvania Zoning Law and Practice* §8.3.2 (1970): "The problem becomes more difficult where it is perfectly clear that the permit has been issued in error. Here it would seem that the interest of the community in enforcing the ordinance outweighs that of the owner *at least until the appeal period has expired and the owner has incurred significant, non-recoverable costs in reliance on the permit.* When this occurs, the owner's good faith reliance on the permit should afford him a vested right to complete the work." (Emphasis added.) Indeed, appellants state that ". . . following the procurement of the Permit on October 8, 1970, the appellants as owners consummated the execution of their building contract with their contractor, obligated themselves on a construction mortgage loan arrangement with the First Federal Savings and Loan Association of Erie to the extent of an $80,-000.00 mortgage obligation and the contractor proceeded with the initial excavation for the footers and the installation of water and sewer lines into the subject property from the mains in 37th Street on which the subject property abutted." They therefore argue that *Gallagher v. Building Inspector, City of Erie,* 432 Pa. 301, 247 A. 2d 572 (1968), is applicable. The Supreme Court there held that a landowner, who receives in good faith a building permit before any action toward a zoning change has begun, acquires a vested interest in the permit even though he has neither spent money nor incurred liability in reliance upon the permit. *See generally* Comment, *Building Permits—Vested Rights Thereunder In Pennsylvania—A New Rule,* 73 Dick. L. Rev. 578 (1969).

We first distinguish *Gallagher* on factual grounds. In that case the landowners were issued building permits for the erection of townhouses, and approximately three months later the city amended its zoning ordi-

nance so as to prohibit the erection of townhouses in the area which encompassed the land covered by the building permits. The city revoked the permits and on appeal our Supreme Court held that the landowners did have a vested right in the permits which had been issued as a matter of right under the then existing law.

Firstly, in the instant case there was no subsequent rezoning to frustrate the issuance of earlier issued, valid permits. Instead, here a rezoning took place before issuance of the permit which particularly favored the applicants and made the issuance of a permit possible. It follows that if the rezoning amendment giving rise to the subsequently issued permit was *ab initio* invalid, then the permit must fall too. Secondly, no confusion, as occurred in this case, surrounded the issuance of the permits in *Gallagher,* particularly as to payment therefor, which in turn created further confusion as to the proper time to appeal.

Furthermore, throughout the cases leading to and including *Gallagher* ". . . there runs the dominating theme of fairness and good faith." *Penn Township v. Yecko Bros.,* 420 Pa. 386, 391, 217 A. 2d 171, 173 (1966) ; 432 Pa. at 304, 247 A. 2d at 573. From an examination of the record in this case, we conclude that there was no good faith reliance on the permit issued October 8 to create a vested interest therein. We assume for purposes of this appeal that the October 8 permit was validly issued, especially because the Board so found initially. We do not decide the question of whether failure to pay the permit filing fee voided the permit, or, such failure being a defect easily corrected, whether the permit was merely rendered voidable. Nor do we decide whether the filing fee, once paid, was simply improperly returned. The important point, however, is that, for whatever reason, a defect in the issuance of the permit was created by the return of the

fee and the request for return of the permit issued, and we are at a loss to understand why the owners felt they could go forward with financial arrangements and construction knowing as they did that such a defect, however serious, surely existed. Schaeffer, the Sales Manager of their contractor, Logan Builders, must have known such fee had to be paid, assuming his version of the circumstances surrounding the return of the check to be true. As Schaeffer himself testified, "In other words when you get the check back after you already had a permit you wonder why." It seems to us an inadequate explanation for him to say, when asked whether he questioned the return of the check, "No, I figured there must be some reason that they were giving it to me, now [that] I already had the building permit myself." In addition, the envelope given to him to use to return the copy of the permit was never used for that purpose. Instead, he turned the permit copy and the check over to counsel for the owners and from October 9, the date on which the check was returned, until December 21, the date on which the owners were required to obtain a second permit, no attempt was made by the owners to pay the permit filing fee. Yet they went forward with financial arrangements and construction.

The record does not reveal the date on which the mortgage agreement was consumated, but it is clear that no construction took place until after the November 20 appeal to the Board. However, one who obtains a building permit and begins construction prior to expiration of the appeal period ordinarily proceeds at his own peril. *Cheltenham Township Appeal*, 413 Pa. 379, 196 A. 2d 363 (1964); *Riccardi v. Plymouth Township Board of Adjustment*, 393 Pa. 337, 142 A. 2d 289 (1958); *Silverco, Inc. v. Zoning Board of Adjustment*, 379 Pa. 497, 109 A. 2d 147 (1954). Certainly one runs

the same risk who executes a building contract and obligates himself on a construction mortgage loan within the 30-day appeal period (or, because of the salutary wording of MPC §915(2), within a reasonable time thereafter).

Now the owners assert the untimeliness of the appeal to the Board because it was made twelve days beyond the appeal period. The Association counters that, although they knew a permit had been issued on October 8, they were unsure of its validity because of the return of the check, and further that the Building Inspector informed their counsel that no valid permit had been issued. They therefore assert that they "failed to receive adequate notice" within the meaning of MPC §915(2), and that their appeal, although filed after the 30-day period, was timely because it was made within a reasonable time thereafter in view of the confused status of the October 8 permit. They argue that they received ". . . no notice that a permit had been issued until November 18, 1970, at which time, David Schneider stated to City Council that he was in possession of a copy of a building permit issued on October 8, 1970." Their appeal was then filed two days later. As support, they point to R. Ryan, *supra,* §9.4.3: "As the cases indicate, the timing of an appeal by protestants can pose a severe problem. Neighboring property owners generally receive no notice that a permit has been issued. Their first knowledge of that fact is likely to be the commencement of construction. If protestants are to have a reasonable right of appeal, they should not be barred unless they had knowledge of the issuance of the permit in sufficient time to permit an appeal within the specified period. On the other hand, if an appeal is allowed after construction has progressed, the applicant may suffer a great loss. The Municipalities Planning Code resolves the difficulty in favor of the protest-

ant, who is permitted to exceed the 30-day appeal limit if he 'alleges and proves that he failed to receive adequate notice' of the approval of the application: Code §915(2), 53 P.S. §10915(2). Since there is no requirement that a zoning officer give notice of the approval of most zoning applications, the practical effect of the Code is to permit an appeal by a protestant filed within 30 days of the issuance of a permit, or promptly after the protestant learns of its issuance."

Although the Association did not file an appeal promptly after actually learning of the issuance of the October 8 permit, we think that, under the circumstances, fairness dictates that we find that the appeal was sufficiently timely within the meaning of MPC §915(2), especially because construction had not yet progressed on the appeal date, and because counsel for the Association reasonably relied on the repeated assertions of the Building Inspector that the returning of the check voided the permit issued on October 8. Because of the confusion surrounding the return of the check on October 9, this case is a highly unusual one, and we otherwise agree that ". . . ordinarily, the proper time to contest the constitutionality or validity of a zoning ordinance is immediately after issuance of a building permit." *Cheltenham Township Appeal, supra,* 413 Pa. at 387, 196 A. 2d at 367.

We move, then, to whether the City Council's rezoning of the subject property constituted illegal "spot zoning." The lower court, in concluding that the July 8, 1970, ordinance was "spot zoning" and therefore invalid, listed its reasons for so holding:

"(1) That all of the other property in the immediate area is zoned R-1, low density residential and consists of single family dwellings.

"(2) That the property in question, consisting of but a single lot 82 ft. by 155.77 ft. constitutes but a small part of the zoned area.

"(3) That the ordinance changing a lot in question to R-3, high density residential, would result in a detriment to the neighborhood as now constituted.

"(4) That there is nothing to distinguish this lot from the other property in the area.

"(5) That there is no evidence of need for multiple family dwellings in the area.

"(6) The record discloses that the property has been and can in the future be used for a one-family residence.

"(7) The record fails to disclose any basis for special or different treatment from that accorded the similar surrounding land.

"(8) That the ordinance has no relation to the public health, safety, morals or general welfare.

"(9) That the proposed rezoning would be solely for the economic benefit of the lot owners, David Schneider and Janice A. Schneider.

"(10) That the amendment was not within the spirit and intent of the 'Erie City Plan For The Future'."

"Spot zoning" has been described as "[a]n attempt to wrench a single small lot from its environment and give it a new rating that disturbs the tenor of the neighborhood. . . ." *Linden Methodist Episcopal Church v. City of Linden*, 113 N.J.L. 188, 191, 173 A. 593, 595 (1934). "The general rule is that 'if a change of zone is reasonable and is in accordance with the comprehensive plan of the zoning ordinance and can be justified as contributing to the public health, safety and general welfare, it will not be held invalid as "spot zoning", even though the reclassification affects only a single piece of property or may incidentally discriminate in favor of the owner thereof.' (Footnotes omitted.) 1 Rathkopf, The Law of Zoning and Planning 26-14 (1962)." *Mulac Appeal*, 418 Pa. 207, 213, 210 A. 2d 275, 278 (1965) (concurring opinion).

We conclude that the rezoning of the land in question constituted illegal "spot zoning" and agree with the following from *Schubach v. Zoning Board of Adjustment,* 440 Pa. 249, 253-4, 270 A. 2d 397, 399-400 (1970):

"It is well-settled that 'an ordinance cannot create an 'island' of more or less restricted use within a district zoned for a different use or uses, where there are no differentiating relevant factors between the 'island' and the district. . . . Thus, singling out of one lot or a small area for different treatment from that accorded to similar surrounding land indistinguishable from it in character, for the economic benefit of the owner of that lot or to his economic detriment, is invalid 'spot' zoning." 8 E. McQuillin, *Municipal Corporations* §25.83, at 224-25 (3d ed. 1965). *Accord, e.g., Mulac Appeal,* 418 Pa. 207, 210 A. 2d 275 (1965).

"The case at bar presents a classic instance of 'spot zoning'—the entire area was zoned residential, the lot is in the midst of detached dwelling houses that are in the $25,000 price range, and the lot does not differ from its neighbors by either location or topography. See, Schmidt v. Philadelphia Zoning Bd. of Adjust., 382 Pa. 521, 114 A. 2d 902 (1955). In the absence of evidence of either a necessity for the rezoning or of relevant differentiating facts between the 'island' and the land immediately adjacent thereto, this rezoning was illegal. Glorioso Appeal, 413 Pa. 194, 196 A. 2d 668 (1964)."

Although this case was well presented by counsel for appellants, their reliance on MPC §§512, 712 and 915 (1), 53 P.S. §§10512, 10712 and 10915(1), is misplaced. We are concerned here with the 30-day period within which an appeal had to have been made to the *Board,* not to the Court of Common Pleas (making §§512 and 712 inapplicable), and, further, because at no time has the Association challenged any "defect in

the progress of enactment" of the amendatory ordinance (making §915(1) inapplicable).

Order affirmed.